# United States Court of Appeals for the Federal Circuit

2008-5051

ASTORIA FEDERAL SAVINGS & LOAN
ASSOCIATION,

Plaintiff-Appellee,

v.

UNITED STATES,

Defendant-Appellant.

Frank J. Eisenhart, Dechert LLP, of Washington, DC, argued for plaintiff-appellee. With him on the brief were Catherine Botticelli, Tara R. Kelly, Catherine Stahl, and Craig Gerald Falls.

John H. Roberson, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellant. With him on the brief were Jeanne E. Davidson, Director, and Kenneth M. Dintzer, Assistant Director.

Appealed from: United States Court of Federal Claims

Judge Thomas C. Wheeler

# United States Court of Appeals for the Federal Circuit

2008-5051

ASTORIA FEDERAL SAVINGS & LOAN
ASSOCIATION,

Plaintiff-Appellee,

v.

UNITED STATES,

Defendant-Appellant.

Appeal from the United States Court of Federal Claims
in 95-CV-468, Judge Thomas C. Wheeler.

_____

DECIDED:  May 28, 2009

_____

Before RADER, BRYSON, and DYK, <u>Circuit Judges</u>.

BRYSON, <u>Circuit Judge</u>.

This is a breach of contract case.  In October 1984, the government arranged for Fidelity New York, F.S.B., a Long Island savings and loan association, or "thrift," to acquire another Long Island thrift that was in danger of failing.  The government assisted the acquisition by offering several benefits to Fidelity, including a promise to allow Fidelity to accord favorable treatment to the "supervisory goodwill" generated by the transaction for purposes of meeting Fidelity's regulatory capital maintenance requirements.

Five years later, Congress enacted legislation that effectively terminated the favorable treatment of supervisory goodwill that had been promised to Fidelity at the time of the acquisition. That change in the treatment of goodwill constituted the breach of contract at issue in this case and in numerous other cases known as "Winstar cases." See United States v. Winstar, 518 U.S. 839 (1996). Several years after that legislation was enacted, the plaintiff, Astoria Federal Savings & Loan Association, merged with Fidelity, succeeded to Fidelity's breach of contract claim against the government, and filed suit in the Court of Federal Claims.

After the government conceded a contract breach, the court conducted a trial to determine damages. Following the trial, the court issued a comprehensive opinion and entered judgment against the government in the amount of $16,042,887. Astoria Fed. Sav. & Loan Ass'n v. United States, 80 Fed. Cl. 65 (2008) (Astoria II). Although the parties have not contested the court's rulings with respect to the bulk of the damages requested at trial, the government has sought reversal with respect to several issues that affect the size of the damages award. We agree with two aspects of the government's argument, but we uphold the trial court's decision in all other respects. Accordingly, we affirm in part, reverse in part, and remand for further proceedings on two of the issues discussed below.

I

The history of the savings and loan crisis in general and the circumstances of Fidelity's financial decline in particular are set forth in great detail in the two Court of Federal Claims opinions in this case. Astoria II, 80 Fed. Cl. at 68–85; Astoria Fed. Sav.

& Loan Ass'n v. United States, 72 Fed. Cl. 712, 713–15 (2006) (Astoria I).  We recount only those facts necessary to the disposition of this appeal.

In the early 1980s, Fidelity's investment portfolio was heavily weighted in favor of commercial loans to developers of condominium and cooperative conversion projects in the New York City metropolitan area.  Fidelity had acquired most of those loans through a June 1982 merger with Dollar Federal Savings and Loan Association, another Long Island thrift.  Following the Dollar Federal merger, Fidelity increased its investment in the New York City real estate market by repeatedly underwriting loans to a small group of condominium and cooperative developers.  The Federal Home Loan Bank Board urged Fidelity's management to diversify the bank's loan portfolio, warning that Fidelity's asset management strategy was giving rise to "considerable credit risk exposure."

During the same period, Suburbia Federal Savings & Loan, another Long Island thrift, was having severe difficulties; by 1984 it was on the verge of collapse.  Federal banking regulators considered Suburbia an ideal target for a government-assisted merger or acquisition because its problems stemmed almost entirely from operating deficits created by the so-called "interest rate spread"—the difference between the high interest rates banks had to pay on deposits at the time and the low interest rates they were receiving on the fixed-rate mortgages in their loan portfolios.  A merger or acquisition had the potential to resuscitate Suburbia until interest rates declined.  Avoiding the bank's collapse would relieve the government of the huge deposit insurance liability that would have resulted from liquidation.

Fidelity agreed to acquire Suburbia in exchange for a package of inducements from the government.  Those inducements included a contribution of $16 million in cash

and permission for Fidelity to treat Suburbia's goodwill as regulatory capital and to amortize that goodwill over a 30-year period. The Federal Home Loan Bank Board agreed to those conditions and formally approved the acquisition in October 1984.

After acquiring Suburbia, Fidelity further expanded its commercial real estate and construction loan portfolios to the point that federal regulators grew concerned that Fidelity's management team lacked the experience needed to run a financial institution of Fidelity's size and sophistication. In mid-1986, Fidelity hired three executives with broad expertise in investment portfolio management—Thomas V. Powderly, William A. Wesp, and Frederick J. Meyer. They immediately appreciated the risks associated with Fidelity's asset allocation. Over the next three years, Fidelity's new management team ceased all new commercial lending activity, diversified Fidelity's portfolio with consumer loans and home equity credit loans, and began investing in corporate and government bonds and mortgage-backed securities. Fidelity also adopted a short-term business plan that emphasized moderate but steady growth through continued investment in securities, further reductions in loan concentrations, and increased credit quality.

In the late 1980s and early 1990s, the New York real estate market experienced a sudden downturn that was exacerbated by the repeal of federal tax laws favoring highly leveraged commercial real estate. The shift in Fidelity's asset management strategy failed to protect it from the downturn, which precipitated an increase in the number of loan delinquencies and defaults in the bank's pre-existing commercial loan portfolio. The Bank Board's October 1987 examination report revealed the extent of the damage to Fidelity's balance sheet: Over the preceding 15 months, troubled loans had

grown from $16 million to $84 million, and total assets of regulatory concern had more than doubled to $118,684,000.

Federal regulators generally assessed a bank's overall financial health by use of a composite score on a 1-5 scale, with 1 being the highest possible rating and 5 being the lowest. The composite score, referred to by the acronym MACRO, was computed based on individual ratings in five different categories: management, asset quality, capital adequacy, risk management, and operations. As compared with the previous examination in July 1986, Fidelity's overall MACRO score on the October 1987 examination had decreased from 3 to 4, and its individual ratings for management and asset quality had decreased from 2 to 3 and 3 to 4, respectively.

On August 9, 1989, Congress enacted the Financial Institutions Reform, Recovery, and Enforcement Act, Pub. L. No. 101-73, 103 Stat. 183 (1989) ("FIRREA"). The new statute and its implementing regulations limited the ability of thrifts to account for supervisory goodwill as regulatory capital and to amortize that goodwill over an extended period of time. The restrictions on the use and amortization of supervisory goodwill formed the basis for the breach of contract claim in this case.

Subsequently, in January 1990, the Office of Thrift Supervision ("OTS") greatly expanded its supervisory role over thrifts with the issuance of Regulatory Bulletin 3a-1 ("RB 3a-1"). Under RB 3a-1, any thrift that had been deemed "insolvent" or had received an overall MACRO score of 4 or 5 would be restricted to little or no growth in assets, subject to the discretion of the OTS District Director to grant a waiver from the restrictions in particular instances. Astoria does not contend that the promulgation of RB 3a-1 or its application to Fidelity breached any promise by the government.

With the change in the accounting treatment of supervisory goodwill, banking regulators projected that Fidelity would fail to satisfy regulatory capital standards on the date FIRREA became effective, December 7, 1989. At the direction of OTS, Fidelity prepared a capital restoration plan in which it proposed to satisfy the tightened capital requirements by drastically curtailing its lending activities and reducing its asset growth to almost zero. The capital deficiencies also rendered Fidelity an "insolvent" institution under RB 3a-1, which meant that the bank would be temporarily barred from originating any new loans or making any investments without prior authorization from the OTS District Director.

OTS issued its November 1989 report on Fidelity's financial condition in July 1990. That report reflected that since the previous examination in October 1987, Fidelity's overall MACRO score had worsened from 4 to 5, and its capital rating had worsened from 2 to 5. Although Fidelity's asset quality rating had remained constant, the report stated that "this area [was] of concern to the examiner due to the high level of non-earning assets and the negative effects this has on the bank's operating results." The report further noted that the volume of Fidelity's troubled loans had increased to $97.7 million as of November 1989, which was "significantly higher than the peer group averages," and that the "continued high level of classified assets [was] due to the bank's prior involvement in acquisition, development, and construction projects, condominium/cooperative conversions and land loans."

Between 1990 and mid-1993, Fidelity made steady progress toward achieving its objectives of improving its asset quality and shoring up its capital accounts. Management exceeded all of its interim capital targets, lowered the credit and interest

rate risks of Fidelity's asset portfolio, and reduced the number of non-performing and troubled loans that had been plaguing the bank. The April 1993 examination report acknowledged the substantial improvements in Fidelity's financial condition and improved Fidelity's overall MACRO score to 3. Despite its successes under the capital restoration plan, however, Fidelity was only marginally profitable. The trial court found that Fidelity's profits were suppressed because its weakened condition forced it to sell assets to generate earnings, to abandon its long-term strategy of expanding its consumer and retail lending businesses, and to reduce payroll, advertising, and overhead expenses to subsistence levels.

In May 1993, Fidelity converted from mutual to stock ownership. It then used the proceeds from the public offering to complete the recapitalization process contemplated by the capital restoration plan. Shortly thereafter, OTS terminated all operating restrictions on Fidelity. Even though Fidelity was then free to pursue business operations as it had before FIRREA, the years of stunted growth under the capital restoration plan had placed Fidelity at a significant competitive disadvantage with respect to its peer institutions. In light of the situation, Fidelity's management concluded that a merger or acquisition would be in the best interest of the bank. After considering several competitors, Fidelity's management solicited Astoria's interest in such a transaction. Astoria was drawn to Fidelity's strong branch network and solid financial statements, and it eventually closed a cash merger with Fidelity on January 31, 1995. The Suburbia goodwill did not survive the merger, because the assignment or transfer of that goodwill was prohibited under both general accounting principles and the provisions of the 1984 agreement between Fidelity and federal banking regulators.

Astoria subsequently brought this action against the United States, alleging that the enactment of FIRREA resulted in a breach of the government's agreement to count Suburbia's goodwill toward Fidelity's regulatory capital requirements and to permit the amortization of that goodwill over a 30-year period. The government conceded both the existence of a contract and the breach of that contract, leaving for resolution only the question whether Astoria could establish any damages attributable to the breach. Following extensive trial proceedings, the Court of Federal Claims awarded $16,042,887 in lost profits and "wounded bank" damages to Astoria. See Astoria II, 80 Fed. Cl. at 96. Although the court found that the breach period began on January 1, 1990, and ended in May 1993, the damages award included additional lost profits through January 1995 to account for the residual effects of the breach.

The government took this appeal from the final judgment.

II

The government first challenges the court's finding that the damages sustained by Fidelity between 1990 and 1993 were proximately caused by FIRREA's restrictions on the accounting treatment of supervisory goodwill. According to the government, Fidelity's asset quality had so deteriorated by early 1990 that regardless of FIRREA OTS would have exercised its authority under RB 3a-1 to limit the bank to little or no growth. Because supervisory goodwill cannot be used to improve asset quality, the government explains, those limitations would have persisted until the bank improved its asset quality rating to a score of 3 in July 1992. The government further argues that, even absent the breach, Fidelity would have voluntarily restricted its growth between December 1992 and May 1993 in order to reduce the costs associated with preparing

financial statements in advance of the bank's public offering, and that any losses during that period were not attributable to the breach. To assess those claims, it is necessary to analyze how Fidelity would have fared in the hypothetical non-breach world in which the FIRREA restrictions on the use of supervisory goodwill were not adopted.

A

The trial court rejected the government's assertion that Fidelity's commercial real estate loans would have rendered Fidelity a "troubled thrift" regardless of the enactment of FIRREA. In so doing, the court overlooked unrebutted evidence of Fidelity's weakened financial condition and of the banking regulators' determination to restrict Fidelity's growth for at least a short period of time immediately following the promulgation of RB 3a-1. For that reason, we conclude that the trial court's damages calculation must take into account the nature of the restrictions that would have been imposed under RB 3a-1 even in the absence of a breach, and the period of time, beginning in January 1990, during which those restrictions would have been imposed on Fidelity and would have limited its profitability.

In February 1990, the District Director of the OTS Northeast Region, Angelo Vigna, concluded that Fidelity was insolvent and invoked his authority under RB 3a-1 to require Fidelity's managers to seek prior approval for any new loans or investments. There is no dispute that, absent the government's breach, Fidelity would have been sufficiently capitalized to avoid being deemed insolvent. However, RB 3a-1 applied not only to insolvent institutions, but also to "associations requiring more than normal supervision," which was defined to include thrifts that had received an overall MACRO score of 4 or 5. Fidelity qualified as an "association requiring more than normal

supervision" because it had received an overall score of 4 as part of its most recent examination in October 1987.

Several months after Fidelity began operating under its capital restoration plan, OTS released the November 1989 examination report in which Fidelity was assigned an overall MACRO score of 5 and individual ratings of 5, 4, and 3 in the capital, asset quality, and management categories, respectively. The low capital rating was virtually ensured by Fidelity's failure to meet any of the three minimum regulatory capital requirements imposed by FIRREA. Even assuming that Fidelity's capital rating would have remained constant in the hypothetical non-breach world, Fidelity's failure to improve its asset quality and management ratings from the prior examination indicates that Fidelity would again have received an overall MACRO score of 4. As Mr. Vigna noted, "[i]f all the component ratings resulted in a 4 composite rating in 1987 and identical component ratings occurred or were given in the 1989 exam, it's inconceivable to me that the composite rating would have improved." Walter Amend, an Assistant Director in the OTS Northeast Region, similarly testified that, even if the Suburbia goodwill had not been discredited, Fidelity's 1989 score "would not be a 5, but it would still be a 4."

Even as to capital adequacy, there is no reason to assume that Fidelity's rating would not have deteriorated absent the breach. Fidelity recorded goodwill as an asset in connection with the Dollar Federal merger, and throughout the late 1980s it treated that goodwill as "non-contractual regulatory capital," i.e., it treated that goodwill as regulatory capital, even though the promise the government made to induce Fidelity to acquire Suburbia did not include the right to treat the Dollar Federal goodwill as capital.

When FIRREA went into effect, Fidelity was still carrying almost $34 million of Dollar Federal goodwill, which represented 27 percent of Fidelity's total capital base. Under FIRREA, Fidelity would not have been allowed to count the Dollar Federal goodwill toward its regulatory capital, and the disallowance of that goodwill, without any breach by the government, would have virtually ensured that the bank would have received an overall MACRO score of 4 or worse and therefore would have qualified as an "association requiring more than normal supervision" under RB 3a-1.

Astoria makes three arguments to counter the government's contention that Fidelity's MACRO score in 1987 and the lack of improvement in its condition by 1989 made it inevitable that Fidelity would be regarded as "an institution requiring more than normal supervision" under RB 3a-1 as of January 1990. First, Astoria argues that Fidelity's 1987 MACRO rating was adversely affected by the impending enactment of FIRREA. Astoria points to nothing of substance to support that theory, however, and it is inconsistent with the trial court's rejection of Astoria's theory that the government had repudiated the contract well before the passage of FIRREA.

Fidelity's capital rating held steady between 1985 and 1987. Any consideration by the examiner of proposed reforms therefore could have affected only the non-capital components of Fidelity's MACRO score. To entertain the hypothesis that the non-capital components were affected by the impending enactment of FIRREA imputes to the bank examiners a degree of prescience that is unsupported by the record. FIRREA was not enacted until August 1989; the legislation was not even proposed until January 1989, which was almost six months after Fidelity's 1987 examination report was released. The evidence adduced by Astoria merely suggests that both the savings and

loan industry and banking regulators were aware that some form of new legislation was likely. We cannot infer from such a tenuous basis that the prospect of regulatory reform materially affected Fidelity's MACRO score.

Second, Astoria argues that it was not asset quality that drove Fidelity's poor MACRO score in 1987, but the regulators' assessment of Fidelity's management. Because the regulators' assessment of Fidelity's management improved over time, Astoria argues that Fidelity's MACRO score would have improved regardless of the lack of improvement in its asset quality. The trial court, however, specifically found that poor asset quality was responsible for Fidelity's October 1987 score, and the evidence showed that the bank's asset quality had not improved by 1990. Moreover, Astoria's argument sweeps aside the most direct evidence of the regulators' assessment of Fidelity's management—the individual management ratings reported as part of the regulators' annual review. Fidelity's management rating steadily worsened from a 2 in 1986 to a 4 in 1991, before reversing course and improving to a 3 in 1992. Even assuming that the regulators thought highly of Fidelity's new management team, that view did not manifest itself in the form of improvements to Fidelity's MACRO score until 1992. There is thus no basis in the evidence to question the testimony of the regulators that, regardless of the evidence as to the regulators' confidence in Fidelity's new management team, Fidelity would still have been subjected to the regulatory restrictions of RB 3a-1, even in the absence of the breach.

Third, Astoria contends, albeit without citation of any evidence, that in the hypothetical non-breach world, the OTS regulators would have waived the restrictions of RB 3a-1 as applied to Fidelity. While it is true that RB 3a-1 vested the OTS District

Directors with discretionary authority to waive the restriction on growth in particular instances, the trial court made no finding that OTS would have exercised that authority to permit Fidelity to grow at the rate contemplated by Astoria's expert. Moreover, the evidence adduced at trial indicated that OTS would have restricted Fidelity's growth in the short term regardless of FIRREA. Mr. Vigna testified that even if Congress had exempted Fidelity from FIRREA's regulatory capital requirements, "we would preclude them from adding any risk to the balance sheet, and that means restraining growth." Mr. Amend likewise indicated that FIRREA did not materially affect the regulators' decision to intercede because, "in 1990, growth would have been restricted based upon the level of problem assets in the bank and its actual financial performance." Astoria emphasizes the evidence that in the course of OTS's regulatory activities, OTS officials became increasingly aware of the experience and ability of the new management team at Fidelity, particularly as Fidelity's performance met or exceeded expectations under the capital restoration plan. Notwithstanding their appreciation of the ability of the new management team, however, the OTS officials unequivocally stated at trial that Fidelity would not have been granted a blanket exception from RB 3a-1 "at least for a period of time, until [OTS] made an analysis that things were getting better." Thus, no evidence supports Astoria's suggestion that Fidelity would have been permitted to grow in the short term immediately following the issuance of RB 3a-1.[1]

---

[1]  The government contends that Astoria has waived the argument that Fidelity would have been granted a waiver of the RB 3a-1 restrictions, but we conclude that Astoria preserved that argument by raising it in its post-trial brief before the trial court.

In light of the evidence as to Fidelity's condition prior to the enactment of FIRREA and the government's strong showing that Fidelity would have been subject to regulation under RB 3a-1 even in the absence of FIRREA, we hold that the trial court's finding that as of January 1990, in the absence of FIRREA, "Fidelity would not have had a low MACRO rating, and would not have been a 'troubled thrift'" is not supported by the record. To the contrary, the evidence indicates that as of January 1990 and for at least some period thereafter, Fidelity would have been unable to grow in accordance with its growth plan due to government restrictions imposed under the authority of RB 3a-1. The trial court's damages award will have to be revised to take account of the effect that RB 3a-1 would have had on Fidelity in a non-breach world.

B

The trial court implicitly concluded that Fidelity would have been able to expedite its improvements to asset quality and thereby escape the growth restrictions of the capital restoration plan before July 1992. The government challenges that conclusion, arguing that asset quality "was the primary basis for the thrift's overall MACRO rating" and that intangible assets, such as the supervisory goodwill affected by FIRREA, cannot be used to improve the credit risks associated with troubled loans. We are persuaded that the record adequately supports the trial court's finding that, absent FIRREA, Fidelity would have improved its overall MACRO score to 3 or better prior to July 1992.

In reaching that conclusion, we need not decide whether supervisory goodwill can be employed to manage or improve troubled loans—an issue on which the parties disagree. There was conflicting testimony about whether Fidelity could have improved its MACRO rating before July 1992 so as to permit expansion. The government's

witnesses testified that it could not have done so, while Astoria's expert testified that it could have. The trial court credited the Astoria testimony, and its finding was not clearly erroneous at least for part of the period before July 1992, even assuming that the government is correct that goodwill could not have been used to solve Fidelity's problems with its troubled loans. In particular, there was testimony at trial that the existence of FIRREA and its elimination of the favorable treatment of supervisory goodwill caused regulators to take "a harsher approach" in examining Fidelity during the period before July 1992.

Even if the regulators' treatment had not changed, Fidelity was well positioned to improve its MACRO rating before July 1992. As the trial court found, Fidelity's troubled assets were "at all times a relatively small percentage of Fidelity's overall asset portfolio," and Fidelity had always demonstrated strong earnings performance notwithstanding the presence of those assets on its balance sheet. By the time FIRREA was enacted, Fidelity's management had moved away from underwriting the types of commercial and construction loans that were of concern to regulators and had turned to diversifying the bank's portfolio through consumer lending and investment in securities. Moreover, Mr. Amend testified that it was possible that Fidelity could have been granted a waiver of the RB 3a-1 restrictions once "things were getting better." Given the limited scope of the asset quality problem and management's demonstrated capacity for rising to the challenge, we conclude that the evidence supports the trial court's finding that Fidelity could have "managed the[] problem loans effectively, especially after the arrival of Mr. Powderly and Mr. Wesp."

C

There is no dispute that by mid-1992 the improvements in Fidelity's asset quality were sufficient to obviate any further need for supervision under RB 3a-1. The examination report for April 1992, which was issued in July of the same year, assigned Fidelity an overall MACRO score of 4 and a rating of 3 or better in each individual category except the capital category. Mr. Amend explained that the April 1992 rating reflected the capital deficit that had resulted from FIRREA and thus, "had FIRREA not been enacted, . . . the [1992 overall] rating instead of a 4 would have been a 3." Thus, Astoria appears to be entitled to expectancy and wounded bank damages for at least the latter half of 1992.

The government argues that the trial court should have denied Astoria any damages for the five months preceding Fidelity's public offering in May 1993. During that period, Mr. Wesp testified, Fidelity was "trying to hold the balance sheet static" in order to save the expense of having to create another set of financial statements for the offering circular. He explained that management's intention was not to stop the bank's growth altogether but to simply avoid "anything extraordinary" or "particularly aggressive" during the pre-conversion period. Because Astoria's proposed growth rate was computed as a quarterly average for the entire damages period, the trial court could reasonably have concluded that the poor growth in the months leading up to the conversion would have been offset by other quarters of above-average growth. Accordingly, the trial court's decision to award damages for the early part of 1993 is amply supported by the record.

D

In sum, it is clear that Fidelity could not have avoided OTS supervision for at least a short period after the promulgation of RB 3a-1 in January 1990. However, there is sufficient evidence in the record to support the trial court's finding that the growth restrictions of RB 3a-1 would have been lifted before July 1992, when OTS issued its April 1992 examination report. On remand, the trial court should make a finding as to when, in the hypothetical non-breach world, OTS would have been satisfied that the limitations of RB 3a-1 were unnecessary. Once the court has determined an appropriate date as the beginning of the damages period, the court should fashion an appropriate award based on the evidence of lost profits and "wounded bank" damages presented at trial.

III

We next turn to the government's contention that the trial court erred in not reducing the lost profits award by deducting certain additional costs that Fidelity would have incurred in the hypothetical non-breach world.

The government seeks a $3.6 million reduction in the award based on the salary and advertising expenses that Fidelity would have incurred if it had expanded its retail lending operations as it had planned to do in the late 1980s. Fidelity did not incur those expenses because, under the capital restoration plan, it was required to limit its growth and retain earnings in order to comply with regulatory capital requirements.

Astoria's damages expert, Dr. Donald Kaplan, posited a damages model that did not explicitly take account of the lending expenses, because he assumed that Fidelity's incremental assets would be mortgage-backed securities and not retail loans. As the

trial court noted, however, Astoria's damages model "did not preclude the possibility that Fidelity would choose to invest in other types of tangible assets on which it might earn a higher rate of return." If Fidelity had continued with its retail lending strategy, Dr. Kaplan explained, the investments in personnel and advertising would have generated additional income that would have been at least "commensurate with the[ir] cost." Because Dr. Kaplan "determined not to build [the expenses] into the model and increase the damages correspondingly," Astoria contends that his damages model was an overly conservative estimate of lost profits. We find no error in the trial court's decision to credit Dr. Kaplan's testimony that the actual rate of return for retail lending operations would have exceeded the rate of return that he used in calculating the earnings from investments in mortgage-backed securities. Based on that reasoning, the trial court permissibly concluded that it was not inappropriate for Dr. Kaplan to omit the savings of salary and advertising expenses from his damages model.

The government also claims that, absent the breach, Fidelity would have been assessed an additional $221,000 in OTS examination fees as a consequence of its larger portfolio of assets.[2] Astoria concedes that deficiency in its lost profits analysis but argues that the government failed to introduce any specific evidence as to the amount of those fees; for that reason, Astoria contends that the impact of that factor on the damages award is speculative. However, both the dollar amount of the hypothetical

---

[2] We reject Astoria's contention that the government waived the issue of higher examination assessments by failing to raise it before the trial court. The government's pre- and post-trial briefs noted that Astoria's damages model presumed a substantial increase in portfolio size, which would result in a concomitant increase in OTS examination fees. The government argued that if the trial judge were to accept Astoria's damages model, "[t]hese additional assessments would then need to be deducted from" any potential lost profits award.

increase in Fidelity's assets and the OTS examination fee schedule were admitted into evidence. We therefore agree with the government that the trial court should have deducted the increased OTS fees that would have been occasioned by Fidelity's projected growth between 1990 and 1993. That adjustment should be addressed in the proceedings on remand.

IV

Finally, we consider the government's claim that the trial court failed to account for the "non-contractual" goodwill from the Dollar Federal acquisition.[3] As noted, the treatment of that goodwill was not part of Fidelity's bargain with the government, and the effect of FIRREA on the treatment of that goodwill therefore was not affected by the breach of contract for which the government is liable.

The government begins with the premise that the projections in Fidelity's 1988 business plan formed the basis for the trial court's finding that Fidelity's growth rate, absent a breach, would have been eight to ten percent per year. The 1988 plan was predicated in part on the understanding that the Dollar Federal goodwill could be counted toward Fidelity's regulatory capital requirements. Even if Congress had honored the regulators' contractual obligations with respect to the Suburbia goodwill, FIRREA would have required that the Dollar Federal goodwill be excluded for purposes of determining Fidelity's compliance with capital standards. Because the lost Dollar Federal goodwill represented approximately 27 percent of Fidelity's pre-breach capital,

---

[3] Astoria claims that the government has raised this issue for the first time on appeal. We disagree. From our review of the record, we conclude that the effect of the loss of non-contractual goodwill was contested throughout the proceedings below.

the government argues, the hypothetical growth rate ought to reflect a similar discount to the growth rate contemplated by the 1988 business plan.

The government's theory lacks force for several reasons. First, the 1988 business plan was not the sole evidentiary basis for the trial court's decision to adopt a hypothetical growth rate of eight percent. Although the trial court found that Dr. Kaplan's proposed rate was "consistent with the projections in Fidelity's October 1988 business plan," the court did so only after noting that eight percent was generally consistent with the bank's historical rate of growth from operations. Second, even with the Dollar Federal goodwill excluded from regulatory capital, Fidelity would have had approximately $37 million in excess capital when FIRREA went into effect. Dr. Kaplan testified unequivocally that "the loss of the noncontractual regulatory goodwill would not have prevented Fidelity from growing" at an annual rate of eight percent.

Cross-examination underscored that point. When government counsel asked Dr. Kaplan why he had not "calculated lost profits related to the contractual goodwill by multiplying the total lost profits attributed to the total goodwill by the percentage amount . . . of the total goodwill that was not contractual," Dr. Kaplan answered that he had "never included Dollar as part of this case." Absent any evidence that the loss of the additional Dollar Federal goodwill would necessarily have had a proportionate effect on Fidelity's annual growth rate, we cannot say that the trial court erred in finding that Fidelity would have sustained a growth rate of eight percent even if it had been carrying only $37 million in excess regulatory capital. We therefore uphold the trial court's ruling with respect to the "non-contractual" goodwill.

Each party shall bear its own costs for this appeal.

## AFFIRMED IN PART, REVERSED IN PART, and REMANDED.